UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

|  |  |
|---|---|
| | :    Case No.: 18-cv-4997-JFK |
| GW HOLDINGS GROUP, LLC, a New York Limited Liability Company, | : |
| | : |
| Plaintiff, | : |
| | : |
| - against - | : |
| | : |
| CRUZANI, INC., f/k/a US HIGHLAND, INC., a Nevada Corporation, | : |
| | : |
| Defendant. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION
<u>FOR DEFAULT JUDGMENT</u>**

THE LAW OFFICE OF JEFFREY FLEISCHMANN, P.C.
*Attorney for Plaintiff*
Jeffrey Fleischmann
150 Broadway, Suite 900
New York, New York 10038
Tel: (646) 657-9623
jf@lawjf.com

1

Plaintiff GW Holdings Group, LLC, ("GW"), respectfully submits this memorandum of law in support of its motion pursuant to Rule 55(b) for default judgment, on the claims set forth in the complaint and amended complaint against Defendant Cruzani, Inc., ("Cruzani"), formally known as US Highland, Inc.[1]

## PRELIMINARY STATEMENT

As set forth below, it is undisputed that Defendant breached its agreements with GW by refusing to honor conversion notices GW submitted, becoming delinquent in its public filings, failing to maintain the reserve, failing to increase the reserve at GW's request, and switching to a transfer agent who was not bound by irrevocable instructions to establish and maintain the reserve and to process conversions, and who also did not have access to books and records necessary to process conversions.  As a result of Defendant's breaches, GW was unable to convert its shares as was its right under the agreements.  Consequently, GW is entitled to damages.

By Opinion and Order dated March 13, 2019, (the "Dismissal Order"), the Court dismissed the complaint filed in this action, finding that it was insufficiently detailed with respect to the minimum $75,000.00 threshold required for diversity jurisdiction.  Following the Second Circuit's reinstatement of the original complaint, GW filed an amended complaint on December 30, 2019, which specified GW's damages for the monetary claim of at least $200,079.74, ($95,136.48 under the May 22, 2018 Notice of Conversion, $68,193.26 under the May 29, 2018 Notice of Conversion, and $36,750 in principal for the Second Note), demonstrating beyond any doubt that it met the jurisdictional threshold.  Subsequently, per the

---

[1] At the time the relevant agreements were entered into, Defendant was known as US Highland, Inc., but has subsequently changed its name to "Cruzani, Inc."

parties' agreement, the Court issued a briefing schedule on December 30, 2019 permitting the filing of this motion.

As set forth below, the uncontroverted evidence demonstrates that GW is owed the sum of at least $200,079.74 in damages, plus default interest and attorneys' fees. We respectfully request that the Court issue judgment accordingly.

## STATEMENT OF FACTS

The facts of this matter are set forth in the declaration of Noah Weinstein ("Weinstein Declaration") annexed hereto. The salient facts are also set forth herein.

On May 17, 2016, after arm's-length negotiations, Cruzani and GW executed a Securities Purchase Agreement, (the "First SPA"). Weinstein Dec. ¶ 2. The First SPA provided, inter alia, for the purchase of a Convertible Redeemable Promissory Note from Defendant to GW, in the amount of $55,000.00, (the "First Note"). Id. A true and correct copy of the First Note is attached as Exhibit A to the Weinstein Declaration. A true and correct copy of the First SPA is annexed to the Weinstein Declaration as Exhibit B.

In accordance with the First Note, Defendant was required to:

> reserve 42,000,000 shares of Common Stock for conversions under this Note (the "Share Reserve"). The investor shall have the right to periodically request that the number of Reserved Shares be increased so that the number of Reserved Shares at least equals 400% of the number of shares of Company common stock issuable upon conversion of the Note…At all times, the reserve shall be maintained with the Transfer Agent at four times the amount of shares required if the Note would be fully converted.

See First Note, § 13.

Concurrently with the execution of the First Note and SPA, on May 17, 2016, Defendant executed an agreement directing its transfer agent to initially establish a reserve in the amount of 42 million shares of stock for GW's benefit, to permit conversion of the First Note into shares of

stock, (the "TA Letter"). Weinstein Dec. ¶ 4. The TA Letter further permitted GW to increase

the amount of shares in the reserve up to at least 400% of the number of shares of common stock

issuable upon conversion of the First Note. Id. On June 15, 2016, Defendant executed another

agreement with the transfer agent, and the share reserve was increased so that 83 million shares

were held in reserve, (together with the TA Letter, the "TA Letters"). Id. A copy of the TA

Letters is annexed to the Weinstein Declaration as Exhibit C.

      In violation of the terms of the First Note and SPA, Defendant failed to remain current in

its public filings with the Securities and Exchange Commission from the period of November 16,

2016 through February 15, 2018. Weinstein Dec. ¶5.

      On February 2, 2018, the parties entered into a "leak-out agreement" permitting GW to

trade the greater of $2,000.00 or 25% of the daily volume of Defendant's shares of stock.

Weinstein Dec. ¶ 6. On February 15, 2018, Defendant finally became current with its public

filings. Id. Subsequently, on March 15, 2018, after arm's-length negotiations, Defendant and

GW executed an additional Securities Purchase Agreement, (the "Second SPA"), which

provided, inter alia, for the purchase of a Convertible Redeemable Promissory Note to GW, in

the amount of $36,750.00, (the "Second Note"). Id. A true and correct copy of the Second Note

is attached hereto as Exhibit D. A true and correct copy of the Second SPA is annexed as

Exhibit E.

      In accordance with the Second Note, Defendant was required to:

> reserve 65,000,000 shares of Common Stock for conversions under this Note (the
> "Share Reserve"). The investor shall have the right to periodically request that
> the number of Reserved Shares be increased so that the number of Reserved Shares at
> least equals 400% of the number of shares of Company common stock issuable
> upon conversion of the Note…At all times, the reserve shall be maintained with
> the Transfer Agent at four times the amount of shares required if the Note would
> be fully converted.

See Second Note, § 13.

On March 15, 2018, Defendant established a reserve in the amount of 65 million shares of stock with its transfer agent. Weinstein Dec. ¶ 8. GW then issued a notice of conversion on March 21, 2018, seeking to convert a portion of the First Note into shares of stock. Id. Defendant honored this notice of conversion and used a portion of the stock reserve set up for the Second Note as part of the shares it provided in connection with this notice of conversion. Id.

Thereafter, on April 27, 2018, GW issued an additional notice of conversion. Weinstein Dec. ¶ 9. In response, Defendant's CEO, Everett Dickson, claimed, "there is no reserve," and that Defendant would not honor the notice of conversion. Id. However, after discussion with GW and its counsel, Mr. Dickson claimed that he "forgot" that GW had a reserve of shares, and Defendant ultimately permitted that conversion. Id. Subsequently, on May 10, 2018, Mr. Dickson informed GW that he will "block" future conversions. Id.

By letter dated May 11, 2018, Defendant's attorney, Antony Newton, instructed the transfer agent not to honor conversion notices and asserted that the past conversions were improper. Weinstein Dec. ¶ 10. Mr. Newton's letter falsely claimed that Defendant was not "eligible to issue shares pursuant to Rule 144," and that the conversions were otherwise improper. Id., Ex. F. Mr. Newton's letter further stated: "I am instructing Columbia Stock Transfer not to issue further shares pursuant to (i) a share reservation under a Convertible Note that is not yet mature, (ii) any instruction letter referencing a share reservation under Rule 144 of the Act, and (iii) a legal opinion referencing Section 4(a)(1) of the Act." Id.

On May 11, 2018, GW submitted a notice of conversion. Weinstein Dec. ¶ 11. Refusing to honor the notice of conversion, Mr. Dickson instead provided GW with a copy of the May 11, 2018 letter from Mr. Newton to the transfer agent, which instructed the transfer agent

not to issue shares. Id. Thereafter, on May 14, 2018, GW requested that Defendant increase the number of shares in reserve in accordance with Section 13 of each Note. Id. Ex. G. Defendant refused to increase the reserve, violating the terms of each Note and SPA. Id. Consequently, on May 15, 2018, GW provided the transfer agent with correspondence from GW's attorney, which explained why Defendant's refusal to honor the conversion notices was a breach of their agreement. Id. Ex. H. Ultimately, Defendant permitted the May 11, 2018 conversion.

On May 22, 2018, GW submitted an additional notice of conversion, (the "First NOC"). Weinstein Dec. ¶ 12. Ex. I. The transfer agent informed GW on May 24, 2018, that Defendant had switched transfer agents. Id., Ex. J. GW proceeded to reach out to the new transfer agent, only to be informed that the transfer agent had no books and records and could not process any conversion notice. Weinstein Dec. ¶ 13. Subsequently, on May 25, 2018, GW again reached out to the transfer agent and Defendant to attempt to get the conversion notice processed. Id. Mr. Dickson affirmatively stated that he would not honor the conversion notice. Id., Ex. K.

On May 29, 2018, GW issued another conversion notice, (the "Second NOC"). Weinstein Dec. ¶ 14. Ex. L. Once again, Mr. Dickson stated that he would not honor any conversion notices, and refused to honor the May 29, 2018 conversion notice, as well. Id., Ex. N

Section 4(a) of the First Note and the Second Note, (together, the "Notes"), each provide as follows:

> The Holder of this Note has the option, upon the issuance date of the stock, to convert all or any amount of the principal face amount of this Note then outstanding into shares of the Company's common stock (the "Common Stock") at a price ("Conversion Price") for each share of Common Stock equal to 45% discount of the lowest trading price of the Common Stock as reported on the National Quotations Bureau  OTCQB exchange which the Company's shares are traded or any exchange upon which the Common Stock may be traded in the future ("Exchange"), for the twenty prior trading days . . . .

Notes, §4 (a) (emphasis omitted).

6

Section 4 of the Notes further provides, "The Company shall deliver the shares of Common Stock to the Holder within 3 business days of receipt by the Company of the Notice of Conversion." Notes, §4 (a). Pursuant to the Notes, "At all times, the reserve shall be maintained with the Transfer Agent at four times the amount of shares required if the Note would be fully converted." Notes, § 13. Furthermore, the Notes direct, "No provision of this Note shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of, and interest on, this Note at the time, place, and rate, and in the form, herein prescribed." Notes, § 5. Accordingly, Defendant's obligation to deliver the stock within three business days of receipt of a Notice of Conversion was absolute and unconditional, and failure to do so constituted a breach. See id.

Section 4(e) of the Notes further provide:

> In case of any Sale Event (not to include a sale of all or substantially all of the Company's assets) in connection with which this Note is not redeemed or converted, the Company shall cause effective provision to be made so that the Holder of this Note shall have the right thereafter, by converting this Note, to purchase or convert this Note into the kind and number of shares of stock or other securities or property (including cash) receivable upon such reclassification, capital reorganization or other change, consolidation or merger by a holder of the number of shares of Common Stock that could have been purchased upon exercise of the Note and at the same Conversion Price, as de- fined in this Note, immediately prior to such Sale Event. The foregoing provisions shall similarly apply to successive Sale Events. If the consideration received by the holders of Com- mon Stock is other than cash, the value shall be as determined by the Board of Directors of the Company or successor person or entity acting in good faith.

See id.

Section 9 of the Notes provides for events of default. Among other things, there is a default under the agreement if: "[t]he Company shall not deliver to the Holder the common Stock pursuant to paragraph 4 herein without restrictive legend within 3 business days of its receipt of a Notice of Conversion . . . ." Notes, § 9(k). Additionally,

there is a breach if "[t]he Company shall not be 'current' in its filings with the Securities and Exchange Commission . . . ."    Notes, § 9(m).  A breach also occurs where: "[t]he Company shall not replenish the reserve set forth in Section 13, within 3 business days of the request of the Holder.  If the Company does not replenish the request of the Holder then the conversion discount set forth in Section 4(a) shall be increased from a 45% conversion discount to a 60% conversion discount . . . ." Notes, § 9(l).  Finally, an event of default occurs where: "[t]he Company shall fail to perform or observe, in any respect, any covenant, term, provision, condition, agreement or obligation of the Company under this Note or any other note issued to the Holder . . . ." Notes, § 9(c).

In direct contravention to its representations, warranties, and covenants in the various agreements, Defendant breached its agreements with GW by refusing to honor the conversion notices GW submitted on May 22, 2018, and on May 29, 2018.  See Notes, § 9(k).  Additionally, Defendant breached the terms of its agreements when it became delinquent in its public filings.  See Notes, § 9(m).  Defendant further breached the agreements by failing to maintain the reserve to allow for adequate shares to be available for conversions, stating that "there is no reserve," and refusing to increase the reserve as per GW's request.  See Notes, §§ 9(l), 13.

Moreover, Defendant's change of transfer agents is a material breach.  Weinstein Dec. ¶ 19.  For GW to exercise the conversion feature of the Notes, one of the most important features of the Notes, it was critical to have a transfer agent bound by irrevocable instructions to establish and maintain a reserve and to process conversions.  Id.  In accordance with its terms, the TA Letters provided, "You are hereby further irrevocably authorized and directed to issue the shares of Common Stock so reserved upon your receipt from the Investor of a notice of conversion

8

("Notice of Conversion") executed by the Investor in accordance with the terms of the Notice of Conversion with no further action by the Company required for the Investor to effect such conversion."  Weinstein Dec, Ex. C.  Likewise, the TA Letters mandate that "in the event that the Transfer Agent resigns as the Company's transfer agent, the Company shall engage a suitable replacement transfer agent that will agree to serve as transfer agent for the Company and be bound by the terms and conditions of these Irrevocable Instructions within five (5) business days."  Id.  The new transfer agent was not bound by the irrevocable instructions to establish and maintain a reserve and process conversions, as no new agreement was signed.  Weinstein Dec. ¶ 19.

Additionally, it was essential for the transfer agent to have access to the books and records necessary to process conversions, and the new transfer agent informed GW that it did not have the books and records and could not process conversions.    Weinstein Dec. ¶ 20.  To wit, under the terms of the TA Letters, GW was able to simply send in a notice of conversion, and the transfer agent was obligated to process the conversion and send GW the requisite number of shares, which were supposed to be held in reserve for GW's sole benefit.  See id., Ex. C.

Consequently, it was a material breach when Defendant violated the agreements and switched to a transfer agent who was not bound to the TA Letters, and who did not have the books and records and could not process conversions.  Moreover, Defendant also breached the underlying agreements by instructing the original transfer agent not to honor conversion notices.

Defendant failed to honor both the First NOC and the Second NOC, and its aforementioned breaches prevented GW from converting the Note into shares of Defendant's stock, as it was entitled to do under the Notes.

Additionally, the Second Note includes a cross-default provision, which states, "The Company shall have defaulted on or breached any term of any other note of similar debt instrument into which the company has entered and failed to cure such default within the appropriate grace period . . . ." Second Note, § 9(h). Accordingly, when Defendant breached and failed to cure its breach under the First Note, it defaulted under the Second Note, as well.

For the above reasons, Defendant is in material breach of the various agreements with GW, and has prevented GW from effectuating conversions of the Notes. Therefore, GW is entitled to damages.

The liquidated damages provisions of the Notes were reasonable at the time of execution of the agreements and are not grossly disproportionate to the conceivable losses that could occur from a breach. Weinstein Dec. ¶ 26. The price of the stock fluctuated widely. Thus, the timing of conversions and sale of stock would be essential to the determination of damages.

In accordance with the First NOC and pursuant to the Notes, Defendant was required to deliver 27,981,317 shares, (or 1,399,056.85 post reverse split[2]), within three business days after May 22, 2018. Weinstein Dec. ¶ 27. Three business days after the May 22, 2018 NOC, on May 25, 2018, the volume weighted average price of the shares

---

[2] On January 10, 2019, the Defendant executed a 1-for-20 reverse stock split.

was $0.068, making the shares that were to be provided under the First NOC worth the sum of $95,136.48.  <u>Id;</u> Ex. N.

In accordance with the Second NOC and pursuant to the Notes, Defendant was required to deliver 18,505,635 shares, (or 925,281.75 post reverse split), within three business days after May 29, 2018.  Weinstein Dec. ¶ 28.  Three business days after the May 29, 2018 NOC, on June 1, 2018, the volume weighted average price of the shares was $0.0737, making the shares that were to be provided under the Second NOC worth the sum of $68,193.26.  <u>Id</u>; Ex. N.

Therefore, damages incurred from Defendant's failure to honor the First NOC and Second NOC total at least $163,329.74, ($95,136.48+$68,193.26=$163,329.74).  This is the appropriate measure of damages.  <u>See LG Capital Funding, LLC v. Accelera Innovations, LLC</u>, 2018 U.S. Dist. LEXIS 137490, at *16-17 (E.D.N.Y. Aug. 10, 2018), No. 17-CV-1460 (DLI) (ST)) (awarding damages for failure to honor conversion notice and noting that "the appropriate measure of damages here is simply the market value of the stock on the day of the breach, which is measured by using 'the mean between the highest and lowest quoted selling prices.'") (<u>quoting</u> <u>Boyce v. Soundview Tech. Grp., Inc.</u>, 464 F.3d 376, 385 (2d Cir. 2006).

In addition, pursuant to the cross-default provision in the Second Note, when Defendant breached the First Note and failed to cure the breach, it automatically defaulted on the Second Note.  <u>See</u> Second Note, § 9(h) (including as part of events of default whether "[t]he Company shall have defaulted on or breached any term of any other note of similar debt instrument into which the Company has entered and failed to cure such default within the appropriate grace period.").  Consequently, Defendant is in

breach of the Second Note.  Accordingly, GW is also entitled to $36,750.00, the sum owed under the Second Note, which has not been paid.  Weinstein Dec. ¶ 33.  In total, GW is entitled to at least $200,079.74, ($163,329.74+$36,750.00=$200,079.74).

Furthermore, GW is also entitled to default interest of 24% from the date of the original breach.  See Notes, § 9(p) ("Upon an Event of Default, interest shall accrue at a default interest rate of 24% per annum . . . .").

## POINT I.
## THE COURT SHOULD GRANT GW DEFAULT JUDGMENT

### A.    Legal Standard

The Second Circuit Court of Appeals has "held that, under Rule 55(b)(2), 'it is not necessary for the District Court to hold a hearing, as long as it ensured that there was a basis for the damages specified in the default judgment.'" Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997) (quoting Fustok v. Conticommodity Servs., Inc., 873 F.2d 38, 40 (2d Cir. 1989).

The Court need not conduct an inquest into the basis of the damages requested in the motion for default judgment, because sufficient evidence filed herewith supports that the proposed damages are appropriate and established with reasonable certainty as a result of Plaintiff's breach. See Action S.A. v. Marc Rich & Co., 951 F.2d 504, 508 (2d Cir. 1991) (holding that a hearing for damages was not necessary, because the District Court judge "was inundated with affidavits, evidence, and oral presentations by opposing counsel."); Fustok v. Conticommodity Servs., Inc., 873 F.2d 38, 40 (2d Cir. 1989) (holding that hearing for damages was not necessary, because "the District Court relied upon detailed affidavits and documentary evidence, supplemented by the District Judge's personal knowledge of the record, gained during

four years of involvement with the litigation"); <u>Tamarin v. Adam Caterers</u>, 13 F.3d 51, 54 (2d Cir. 1993) (concluding that the district court did not abuse its discretion in refusing to conduct a hearing on damages even when it "determined damages with the aid of a single affidavit only partially based upon real numbers").

By its terms, Federal Rules of Civil Procedure Rule 55(b)(2) permits – but does not require – a district court to hold an oral hearing for a damages inquest. Fed. R. Civ. P. R. 55(b)(2); <u>Bricklayers and Allied Craftworkers Local 2, Albany, N.Y. Pension Fund v. Moulton Masonry & Const., LLC</u>, 779 F.3d 182, 189 (2d Cir. 2015) ("[T]he court may conduct such hearings or order such references as it deems necessary and proper.") (internal quotation mark and citation omitted). "That rule allows but does not require the district judge to conduct a hearing." <u>Id.</u>

**B.    The Court Should Grant Damages of $95,136.48 under the First Notice of Conversion and $68,193.26. under the Second Notice of Conversion**

The Court should grant GW's motion for default judgment and award damages to GW based on the uncontroverted evidence of Defendant's breaches of its agreements with GW as set forth below.  It is undisputed that Defendant breached its agreements with GW by refusing to honor conversion notices GW submitted, becoming delinquent in its public filings, failing to maintain the reserve, failing to increase the reserve at GW's request, and switching to a transfer agent who was not bound by irrevocable instructions to establish and maintain the reserve and to process conversions, and who also did not have access to books and records necessary to process conversions.  As a result of Defendant's breaches, GW was unable to convert its shares as was its right under the agreements.  Consequently, GW is entitled to damages.

Judge Sullivan established the correct formula to measure damages in an identical situation.  <u>See</u> <u>Union Capital LLC v. Vape Holdings Inc.</u>, 16 CIV. 1343 (RJS), 2017 WL

1406278, at *6 (S.D.N.Y. Mar. 31, 2017). Judge Sullivan held that damages from the right to exercise conversions should be measured as follows: "To award damages for this breach, the Court would take the date of the breach and determine the conversion price [plaintiff] was entitled to on that date, the number of shares [plaintiff] was authorized to convert, and the market price of those shares on the date of the breach." Id. That is precisely the formula that GW requests the Court to exercise here.

As set forth above, the volume weighted average trading price of Defendant's shares on May 25, 2018, (three business days after the First NOC was sent), was $0.068. See Weinstein Dec. ¶ 27; Ex. N. (chart depicting the volume weighted average trading price on May 25, 2018). Thus, on May 25, 2018, the value of 27,981,317 shares was $95,136.48. Accordingly, GW's damages for Defendant's failure to deliver the stock in accordance with the First NOC is at least $95,136.48. Id.

As described above, under this calculation, GW is entitled to damages of at least $68,193.26 under the Second NOC. The volume weighted average trading price of Defendant's shares on June 1, 2018, (three business days after the Second NOC was sent), was $0.0737. See Weinstein Dec. ¶ 28; Ex. N. (chart depicting the volume weighted average trading price on June 1, 2018). Therefore, the value of 18,505,635 shares would have been worth the sum of $68,193.26, on June 1, 2018, the day Defendant was required to deliver the stock to GW. Thus, GW's damages for Defendant's failure to deliver the stock in accordance with the Second NOC is at least $68,193.26. Id.

In addition, as previously explained, GW is entitled to damages of $36,750.00 under the Second Note. Pursuant to the cross-default provision of the Notes, when Defendant defaulted on

14

the First Note, it breached the Second Note, as well. Consequently, GW is also entitled to $36,750.00, the damages equal to the principal of the Second Note.

**C.     The Court Should Award Default Interest for Each Breach and On The Balance of the Second Note**

In a case involving breach of contract, the interest is measured from the date of the breach or the "earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred." C.P.L.R. §5001(b). An award of interest is "often appropriate from the time at which a party was deprived of the use of money." Calgon Carbon Corp. v. WDF, Inc., 700 F. Supp. 2d 408, 416 (S.D.N.Y. 2010). "Under New York law, prejudgment interest 'shall be recovered upon a sum awarded because of a breach of performance of a contract.'" NML Capital v. Republic of Argentina, 621 F.3d 230, 239-40 (2d Cir. 2010) (quoting N.Y. C.P.L.R. §5001(a)). Accordingly, GW is entitled to an award of twenty-four percent (24%) default interest from the date of default. See Notes, § 9(p) ("Upon an Event of Default, interest shall accrue at a default interest rate of 24% per annum . . . .").

Therefore, the Court should award default interest of 24% on the sum of $95,136.48 from May 25, 2018, the date of the breach as it pertains to the First NOC, which is three business days after the First NOC was sent. See Notes, § 9(p); Ex. A, Ex. D (default interest calculation).

Likewise, the Court should award default interest of 24% on the sum of $68,193.26 from June 1, 2018, the date of the breach as it pertains to the Second NOC, which is three business days after the Second NOC was sent. See Notes, § 9(p); Ex. A, Ex. D (default interest calculation).

Similarly, the Court should award default interest of 24% on the sum of $36,750.00, the balance remaining on the Second Note, from May 25, 2018 because when Defendant defaulted

under the First Note and failed to cure that breach, it breached the Second Note.[3] See Second Note, § 9(h) (including as part of events of default whether "[t]he Company shall have defaulted on or breached any term of any other note of similar debt instrument into which the Company has entered and failed to cure such default within the appropriate grace period.").

### D.    The Court Should Award Attorneys' Fees Pursuant to The Agreements

As set forth in the Fleischmann Declaration, GW has incurred attorneys' fees and costs of $41,607.80 in prosecuting this action.  Fleischmann Dec. ¶¶ 23-25.  GW is being billed at an hourly rate of $400 per hour.  Fleischmann Dec. ¶¶ 23-25.  GW's counsel has approximately 12 years of experience, is admitted to the bar in New York and New Jersey, the Southern District of New York, the Eastern District of New York, and the United States Court of Appeals for the Second Circuit.  Id.  A copy of the invoices for the work billed on this matter to date are annexed to the Fleischmann Declaration as Exhibit 5.  These invoices were contemporaneously rendered and accurately reflect the work done on this matter.  Fleischmann Dec. ¶ ¶¶ 23-25.  Other Courts in this District have found that based on GW's counsel's years of experience, his similar hourly rate was reasonable.  See Blue Citi, LLC v. 5Barz International, Inc., 16-CV-9027 (VEC), 2018 WL 4500870, at *11 (S.D.N.Y. September 19, 2019).

Pursuant to the Notes, Defendant agreed "to pay all costs and expenses, including reasonable attorneys' fees and expenses, which may be incurred by the Holder in collecting any amount due under this Note."  Notes, § 7.  Additionally, in the event of default under the Notes,

---

[3] To the extent the Court disagrees with the interest calculations, it may set a reasonable intermediate date in accordance with C.P.L.R. §5001(b).  See Conway v. Icahn & Co., 16 F.3d 504, 512 (2d Cir. 1994) (stating that C.P.L.R. §5001 "grants courts wide discretion in determining a reasonable date from which to award pre-judgment interest").

> If the Holder shall commence an action or proceeding to enforce any provisions of this Note, including, without limitation, engaging an attorney, then if the Holder prevails in such action, the Holder shall be reimbursed by the Company for its attorneys' fees and other costs and expenses incurred in the investigation, preparation and prosecution of such action or proceeding.

Notes, § 9(p).

Courts generally will "order the losing party to pay the amount actually incurred, so long as those amounts are reasonable." Carco Group, Inc. v. Maconachy, No. CV 05-6038, 2011 WL 6012426, at *2 (E.D.N.Y. Dec. 1, 2011). "Courts in this Circuit employ a 'presumptively reasonable fee' standard to determine the amount to award as attorneys' fees, which 'boils down to what a reasonable, paying client would be willing to pay, given that such a party wishes to spend the minimum necessary to litigate the case effectively.'" Id. (quoting Simmons v. New York City Transit Auth., 575 F.3d 170, 174 (2d Cir. 2009).

Accordingly, GW respectfully requests that it be awarded $41,607.80 as and for the attorneys' fees and costs incurred.

Dated: New York, New York
January 5, 2021

LAW OFFICE OF JEFFREY FLEISCHMANN PC
By: /s/ Jeffrey Fleischmann
Jeffrey Fleischmann, Esq.
*Attorneys for GW Holdings Group, LLC,*
150 Broadway, Suite 900
New York, New York 10038
Tel. (646)657-9623
Fax (646)351-0694
jf@lawjf.com